May it please the Court, my name is Frank Patrick and with me at council table and who will be participating in argument is Richard Gaines. We would like to reserve five minutes for rebuttal. I will argue for seven and Mr. Gaines will argue for eight. This case is really a continuation of the saga of this plaintiff and these appellants to obtain refunds or as Mr. Reichman points out in his reply or response brief, these are not overcharges. Well for the commoners such as my clients, the whole issue is really kind of a moot point. They haven't gotten the money back that they were told they were going to get back by FCC orders. They were told to get back by whom? That they were ordered by the Telecommunications Act and the Oregon PUC that they would receive back for payments that they made and Qwest has held since 1996. Pardon me, sir. What funds did the PUC order to be paid back which were not paid back? They're the funds that is the difference between a rate that was not compliant with law and I'm not asking what you claim to be the payment that is due, but I heard you say that the PUC has ordered payment of refunds that have not been paid back. Is that correct? That is correct. What order are you referring to? Referring to PUC order 190 and 191 and I believe that's ER 208 and 209. And when were they entered? Those orders were entered in 2000. And those are the fees that you're trying, the refunds you're trying to get, they were ordered in 2000? That's correct, but you cannot calculate those fees, those refunds, until the final order of the PUC is entered. You weren't paid those refunds in 2000. No. You didn't know how much they would be. Could not be determined. Right. Let me ask you a question, sir. Suppose I have an accident and I'm a plaintiff and I have a broken leg and I can't get back to work right away. Do I have to wait until my leg is healed to get back to work? To know that I've been injured in that particular? Absolutely not. No. I don't because I file for medical expenses to be proven, right? That's correct. Wage loss to be proven. I don't know what the medical expenses are going to be. I don't know what the wage loss is going to be, but I know I've been injured. That's correct. You knew that you hadn't gotten paid back in 2000. But we didn't know because the liability for that obligation has to first be established by the setting of a final rate. That's been the administrative law in this country, in this state, for over 80 years. I'd like to hear Mr. Reichman on that. Can I focus your attention? You don't have a lot of time. I'm sorry. I thought he was asking Mr. Reichman. No, not later. We're talking about when he gets up there. Let me focus your attention on a couple of matters that are of concern to me. As I understand the case, it has a very long history and I tried to make sense out of it. We think we have the historical part of this okay, but as I understand it, you were at the point where you filed this current case raising state law claims. And the issue is, the problem here is that on these state law claims now, the district court basically determined that they were untimely. I believe that's correct. Pretty much. Yes. Although there's some other questions about estoppel or collateral estoppel and whether you state a claim with some of these claims. But by and large, they were untimely. So that gets us to the whole idea of accrual of each cause of action and tolling. Yes. Correct? Yes. All right. So each one of these statutes, each one of these state causes of action has a different accrual date. Just about. I mean, I guess some of them have the same time period. And under this Oregon statute, it's when you, as Judge Abeya was suggesting, it's when you reasonably should have known that you had a claim, not the full extent of the claim. Is that correct? I understand his question, yes. There's a response to that, though. Okay. So would you, and I don't want you to spend a whole lot of time on this, but what's your best argument that on the accrual date of these causes of action? Okay. Very simple. If you have no final rate, and that's the case here, until November of 2007, then you can't establish the difference between how much is owed when you change the rate that they were being charged and actually paying every month until 2003 when Quest voluntarily reduced the rate. But until you have a judicial determination of what the rate is fair and just by the PUC, no one can go to court and say, pay us that money. In fact, that's part of the stipulation. If you look at it, it's Appendix A, where it specifically says, I think it's page 9 and 10, where it specifically says the parties agree, the PUC and Quest agree, that until there's a final rate, nobody can make a claim. So is that the fundamental problem from your perspective with the district court judge's analysis? And she went through each one very carefully. Sure. But she got it wrong because she wanted to start an accrual date that was six years before the final rate was established. You can't have an accrual in administrative law of a final rate or an action to obtain funds for refund until you actually have the standard, meaning the final rate is established. In other words, when the PUC in its A4 ordered Quest to file a rate case, everybody knew that the rates were going to fall. At least we all believed that. I wasn't here. Mr. Reichman was. But until there is a judicial determination by the PUC in its administrative hearing, then there is, it's not ripe for anybody to come to court. And, in fact, that was said to Judge Brown. Well, okay. So let me back. Now, let me just shift a little bit. But so the first case, NPCC 1, that Judge, I guess, Judge Brown, or Aiken, was it Judge Aiken? No, Judge Brown. Judge Brown. So she kicked, she dismissed that. She found that there was, whatever, you didn't have a claim on the, or there was no Federal claim or whatever. I don't remember. Whatever she did. And she dismissed, she said, I'm not going to assert supplemental jurisdiction over all those other State law claims. Correct. Correct? Correct. In the meantime, and you don't, and the plaintiffs don't go over to State court and file another lawsuit. That's actually what this lawsuit does. Right. But at the time she dismissed it. You didn't run right over to State court and file a lawsuit. No, because we appealed it. Right. So instead you appealed this, goes up, gets affirmed, I think. Yes, it does. Gets affirmed, goes back. There's another lawsuit. I can't, a little bit of this. There's another lawsuit or a couple of lawsuits. And eventually we get to this lawsuit. Correct. Correct. And you ledge all these claims. So let's just assume for a minute, if you get, if you're completely correct on the accrual, do you need any tolling? No. Because the first earliest point would be in 2008, and even at the earliest time it would be a six-year tax intimidation, which would be 2014. We filed this far before that. Okay. Now, if we were to disagree and sort of agree somewhat with Judge Brown's accrual determinations, do you need tolling? I don't believe so, except with respect to one of the cases. One of the claims is based on the Oregon statute for unfair labor practices, and that's under, that would be under a six-year statute. You don't need any tolling under 28 U.S.C. section 1367? We believe that 28 U.S.C. 1367, okay, they were appealed, and I think that's what the issue that Mr. Reichman has raised, Quest has raised, is that somehow or another those claims didn't get appealed. But we believe that, in fact, it is tolled, you're entitled to the tolling. But you don't have to get to that if you get the accrual date correct. Well, but I said, you know, assume that we think that Judge Brown may have gotten some of those accrual dates correct. Just assume that. Then how does 1367 help you? Because it holds, it tolls things, it tolls the running of the matter until the mandate has been issued. Well, and it doesn't say that literally. Do you have a case that says that? It says, the period of limitations for any claim asserted under subsection A, which is the pendant or supplemental state law claims, and for any other claim in the same action that is voluntarily dismissed, or after the dismissal of the claim under subsection A where the judge says, I'm not asserting supplemental jurisdiction, shall be tolled while the claim is pending. Correct. So you're saying that it's pending in Federal court no matter what, as long as the mandate from the Ninth Circuit, and it's appealed until the mandate from the Ninth Circuit issues. That's the way I read the law. That's the way you read it. That's the way I understand it. What case? I'm sorry, I have to. Do you have a Ninth Circuit case that says that? I'll have to dig it up, but I think we do. Okay. Well, just. I'll leave that for Mr. Pencia. You can look at that one. Okay. All right. So in your view, that should be read to mean until the mandate issues. Well, if it's on appeal, is the case still pending? That's the question that I think you're asking. Well, are the claims still pending, the State law claims? Okay. The State law claims. In other words, the proposal would be, oh, you're supposed to bifurcate your case. Take your cause of action, do State law claims in some different proceeding, and go forward with the Federal claims that you have pending in the appeal. But that's not the way that I have seen it. In fact, I don't think there's a single case that says that you can bifurcate it in that way. Well, you don't talk about bifurcating. The District Court just says, you know, look, I got rid of all these Federal claims. They're gone. This case should really, what's left are nothing but State law claims. They really belong across the street. So bye. See you later. Okay. You're gone. Now, how do I appeal the Federal claims while at the same time the State law claims are going to be brought? Well, when you go up on appeal, couldn't you say, we also appeal the Court's failure, you know, the Court's decision not to assert supplemental jurisdiction. And if this Court reverses the Federal claim, reverses the District Court's ruling on the Federal issue, we ask you to, you know, we ask you to bring back those State law claims. The way I read the notice of appeal and the requirements for that, as long as you appeal all the orders of the District Court, which we did, that's in the notice of appeal, then those matters are all on appeal. And that means they're still pending. That's the way I understood it. But you didn't argue the dismissal of the State law claims was incorrect in your opening brief. No, we didn't. But that matter was already resolved by the Ninth Circuit, Your Honor. The Ninth Circuit took Mr. Reichman's motion on that and basically denied it and never revisited it again. So we believe that that issue was resolved. In fact, that's one of our four points there, is the Ninth Circuit found State law claims were appealed. And so 28 U.S.C. does, 1367 does apply, meaning they were being held and told while the appeal was in process. And in fact, I think your time is up. I want to give it to you. Okay. I was going to ask you, I sort of consumed your time, but did you want to make any other point quickly that you were going to emphasize? Well, I think that the important point is, is that the refunds have never been paid. Right, we understand that. Because they couldn't, okay. But well, thank you for understanding that, because one of the Oregon State courts Well, we understand they haven't been paid. I don't know that we agree with all your theories, but we know that they haven't been paid. And that's what this litigation is all about. Really? Really, it's all about people who paid money that were not later determined to have owed that money when the rate fell. Okay. And that's the money that we're looking for. Let your, he's getting very anxious over here. I can see that. Good morning, Your Honor. My name is Richard Gaines. I do want to clarify a couple of points. We do need the tolling provisions of the 1367 and under State law. Because of the dismissal of the State law claims from the original case, because that then required us to wait until the federal appeal was finished, we cite the Beecham case, the district court was mistakenly under the belief that case was overturned by two cases that are clearly distinguishable. That Beecham case which said where exactly what happened here, federal claims dismissed with prejudice, State law claims dismissed without prejudice for lack of jurisdiction, except that Beecham, the plaintiff there, did exactly what the district court said you had to do, file them in State court. File them in State court, subsequently appeal the federal dismissal. State court said this action is pending in the federal court on appeal. Therefore, you cannot proceed in the State court and dismiss those claims. Beecham was reaffirmed in Fannie Mae, whoops, I thought I'd shut this off. I apologize. It was reaffirmed in Fannie Mae, which specifically referenced Beecham, so the tolling does apply. The reason we need a tolling is because of the dismissal of the case here and had to refile in State court. And if you don't apply tolling, instead of starting a date November 2009, we end up with a date in 2013 and a date under State law which we could not have brought sooner. So you can correct me if I'm wrong, but my understanding of the tolling provision under Oregon law is that it relates to what the district court did. It's limited to the district court's judgment. No. No? Is there an Oregon court of appeal decision that says that it also applies to the Ninth Circuit? Yes. The Oregon court of appeals in the Beetham case says that once you appeal anything on the merits in the federal case, and in fact, that case was when they, once you've appealed it, it's pending in the federal court, and you cannot recommence an action in the State court because you have another action pending. So what happened in Beetham is exactly what the district court said you're supposed to do. And under Beetham, it's clear that's wrong. That's exactly what Beetham says. It's wrong. Now, the reason you need the tolling is because if you start back in November of 2009, which is when it should have been deemed to be filed, obviously the claims that accrue in 2008, as we maintain, excuse me, and I want to address for a moment Your Honor's first hypothetical, I think it's the wrong hypothetical. Assume that the claim arises if you're a woman, if you're pregnant. You are either pregnant or not pregnant. There's no partial pregnancy. That is the nature of these rates. When you claim that the rate is unjust and unreasonable, under Oregon law, you have no claim until two things occur. One, you must bring a case before the PUC in a case specifically addressing the reasonableness of the rates. And only once the PUC determines the rates are unreasonable do you have a claim. So you can't be partially, you can't have partial damages. You either, the rate is either found to be unreasonable or it's not. If it's a reasonable rate, you have no damages. If it's not reasonable, you do. Then you go to court. The rate case was the only proceeding that satisfied that criteria. And those rates were not made final until November 2007. In that order that was first adopted, the rates, all those rates became final, except those that were appealed. The only rates that were appealed were these payphone rates. Under Oregon law, once you appeal, those rates remain interim, not final. So at that point in time, once those rates were appealed, they could not be, they're not final. You have no damage claim. So with respect to that, that means throughout that period, the rates were not final. November 15, 2007, PUC adopts final rates. 60 days go by, they're not appealable anymore. Those are now the final rates that are not subject to appeal. How much time does Quest have to pay the refunds? A reasonable amount of time. But the settlement orders specified 45 days. We'll take those dates, November 15, 2007. That's the date the rates are approved. January 14, 2008, rates are now no longer appealable. 45 days later, February 28, 2008. That's when every claim based on an unjust and unreasonable rate becomes, you have a claim at that point. Because if you didn't get your refunds, that's when your claim arises. Are there any Oregon Supreme Court cases or court of appeal cases that have addressed that precisely? If you look at Gerhardt, which we quote in our brief, specifically references McPherson, Oregon v. Washington for that proposition. And Gerhardt specifically says you can't go to court until that process happens, as I described it. There's also Oregon statutes that require that same process. I think it's 757.722 and 765 require that. Okay. So as I said, now, with respect to the order. Your time is running out. Okay. We reserve some time for rebuttal. I'll see. Good morning, Your Honors. May it please the Court. Lawrence Reichman for Defending Quest Corporation. We haven't talked about remand. So I'll wait and see if the Court has any questions about that. But let me address Judge Bea's questions about the refund order. And the fundamental problem here is that plaintiffs are completely mischaracterizing the nature of the refund that Quest was required to make by the PUC in 2000. The plaintiffs state that Quest was ordered to refund the difference between the rates it charged during the rate case and the final rate set by the PUC for every single service. That's hundreds, if not thousands, of services. That is entirely incorrect. The PUC ordered Quest to make a refund in a lump sum at the conclusion of the first phase of the rate case, which established Quest's revenue requirement. It did not require any additional refunds at the conclusion of the second case, called rate design, when rates were specifically set. The refund that the PUC ordered Quest to make was in the total amount of $272 million. And that was divided among customers in very rough fashion to achieve sort of rough justice. And, in fact, many customers got refunds for services for which the rates did not change during the rate case. And that was the PUC's way of providing compensation to those customers for what it considered to be bad service. So, for example, the rate for residential service was $12.80 per month before the rate case started. The rate today is $12.80 per month. Those customers for residential services received a refund of over $100. As compensation, that was how the refund was ordered. So their argument that the PUC ordered Quest in 2000 to make a refund based on the difference between the rates charged during the rate case and the rates established at the end of the rate case is a complete figment of their imagination. They're making that up. And that's what they base their accrual argument on. And it's just completely wrong. And your honors can be certain, if Quest had not made the refunds it was required to make by the PUC's order, we would have been hauled in front of the PUC to answer for that. The commission does not abide violations of its orders and protects its customers. So your position is that Quest was ordered to refund $272 million in 2000 or in 2001? 2000. And it did so? It did so at the end of 2000. So if at that point the plaintiffs here thought that they were getting short change, they could have sued? And that's correct. And they did. They filed a claim in May of 2001 basically saying Quest did not comply with its obligations under federal law to file new service compliance rates and that they're entitled to refunds under a federal order, under an FCC order. That was the very first case they filed. And that was the refund case? That's the so-called refund case. Correct. So what happened in that case? That case was filed at the PUC. It stayed for a while pending FCC action on similar issues. The FCC never took action. The case was revived by the PUC in 2009. Ultimately in 2011 the PUC granted Quest's motion for summary judgment, deciding that Quest did not have an obligation to make a refund under the FCC's order. The plaintiffs appealed that to the Oregon Court of Appeals, which affirmed the PUC's order. They sought reconsideration in the Oregon Supreme Court. This is not in the briefs because this happened just this year. And the Oregon Supreme Court has denied review. So the plaintiffs did sue in 2001. Through the PUC? At the PUC, correct. In the meantime, they appealed the dismissal of the case that they filed in federal court. They filed their first federal case in 2009. So that was ultimately dismissed and appealed and affirmed by this court. They filed three other federal cases. The federal case was what we call MPCC 1. Correct. Which was on the claim that they were plaintiffs representing the interests of the state of Oregon. That was actually I think what we're calling MPCC 3. Three. What was MPCC 1? MPCC 1 is the case that we were talking about here where they filed 18 claims, five claims clearly based on federal law, 13 claims based on state law. That's the case that Judge Brown dismissed the federal claims on statute of limitations, declined to exercise supplemental jurisdiction on. That was that case. And then it comes up here. Correct. We affirm. Correct. In the meantime, they don't file a lawsuit in state court. Not right there. They declined to assert supplemental jurisdiction. Correct. Right? They did not file a lawsuit in state court immediately. In fact, they filed another case in federal court. They filed a third case in federal court, which is the . . . I'm sorry. They filed a third case that we removed to federal court. That was the one filed purportedly on behalf of the state of Oregon to enforce these orders. And then they filed this fourth case. This case. Yeah. Right. So when do all the state law causes of action accrue? The claims that they are asserting here accrued in . . . at the very . . . well, they accrued in 2001. It's the same essential type of claim that the court considered in NPCC-1, in the first federal lawsuit. It's the same essential type of claim that they were on notice of when they filed the refund case in 2001. It's all based on their allegation that Quest failed to comply with the Telecom Act and the FCC's orders by filing new service test compliant rates in 1997. When they filed the claim at the PUC in 2001, they said they had powerful evidence that Quest had not complied with the requirements. They could certainly have filed all of these claims at that time. They chose to file one claim. Were they required to file a claim first in the PUC, the Oregon PUC? I don't think so. I think they could have gone to court. In fact, when there was a change of counsel from prior counsel to Mr. Patrick, he asserted that the PUC actually didn't have jurisdiction over the claims that his client had filed at the PUC. He claimed that those claims should have been filed either in court or at the Federal Communications Commission. So they were not required to file at the PUC. In fact, he kind of resisted PUC jurisdiction over the claims that were So it looks like to me, and I'm not speaking for my colleagues or anything, I have my own little chart here that I tried to put together, but it looks like claims 1 through 7 and 13 likely began to accrue in 2001. I don't disagree with that. You don't disagree with that? No. You would agree with that? And that claims 8? I'm going to need my cheat sheet as to the claims. Excuse me. I have multiple cheat sheets. So I'm looking at my brief where we describe the claims. Claim 8. And claims 10 through 11 looks like they might have begun to accrue in 2004. Because that's when they become aware of the cost data and whatnot. That's right. 10 and 11 are really an entirely different type of claim. They have nothing to do with refunds. They have nothing to do with rates paid. These pay phone owners are claiming that they were denied certain services that were provided to other pay phone owners. Those claims accrued in 2004. That's correct. Okay. So then my next date that I have for claim 12 looks like it might have began to accrue in 2007. Claim 12 I think is actually the same one I just talked about. I may have misspoken. Claim 12 is the same one where they said they were denied access to advanced services. And that would have happened in 2004. That's a claim for loss of business opportunity. It's tortious interference. I've got tortious interference. I quoted loss of business opportunity. But interference with business, correct. Yeah. I guess I'm using those synonymously. But, again, they claim they were denied access to certain services that other pay phone owners were offered. Clearly they would have been on notice in 2004 because they would have asked for those services and been denied them. And that's what Judge Brown found. So if claims 10 and 11 accrued in 2004, and if they get the benefit of tolling, wouldn't those claims be timely? Well, I'd have to go back and consider the various limitations periods. Some of those claims have two-year limitations periods, I believe. So those would have expired before they filed the first lawsuit. Well, I said, well, if they get the benefit of tolling under the federal tolling statute, wouldn't that save those claims? No. Why not? Because NPCC-1 was filed in 2009. So if their claims accrued in 2004, they would have expired in 2006. I guess that would depend on what the statute of limitations were, right? Correct. Which I don't quite have right in front of me. But those, I believe the court found, the district court found that the period of the ---- Well, I thought that, you know, I'm checking my little sheets here, that the Unfortunately, I don't have that in my cheat sheet. I apologize. Sorry, I can't respond to that. Okay. There are other reasons why those claims are not well stated. Well, that's a whole other issue. Okay. But I'm just talking about limitations. Right. And I think there was one, I think the court did consider tolling for one of those claims. I think it might have been claim 12. And it did do the analysis and concluded that even if they got the benefit of tolling, those expired. Remember that the court decided that the tolling period terminated as soon as the district court entered its order or judgment, not on appeal. So that was in 2010. And then they didn't file this case until 2013. Why shouldn't they get the benefit of the tolling, the federal tolling statute in this instance? The federal tolling statute also talks about when the claim is dismissed, I believe. And that should apply to, that should apply to when the order of dismissal is entered by the district court. Well, it just says the limitations period for any claim asserted under subsection A and for any other claim in the same action that is voluntarily dismissed or after the dismissal of the claim under subsection S when the district court declines to assert supplemental jurisdiction. Correct. Shall be tolled while the claim is pending. So I would, I have two responses. First, I would say pending refers to pending prior to dismissal at the district court. Secondly, if that were read to include the time when those claims were on appeal, they were not on appeal. Plaintiffs agreed that the court should not exercise supplemental jurisdiction. Plaintiff did not raise any issue whatsoever about that. So it did not appeal the dismissal of those claims. Well, you know, lots of times when you have a claim, multiple claims in district court, when you have state law claims that are directly related to the federal claims, they're intricately connected. And lots of times the district court will say, hmm, I don't have federal jurisdiction or these federal claims fail for some reason, and just says, well, you know, we got rid of this federal claim. I'm not going to fuss with the state claims. I'm just not going to sue. And so then it goes up on appeal. They're really connected. I mean, the whole purpose of 1367, if you read some of the history of it, is, you know, it's intended to protect, the federal court should remain open to parties in this situation that have both federal claims and state law claims. And it's meant to give them one forum where they can pursue both their state claims and their federal claims. Your Honor, I first need to apologize that I don't have the law on how that's been interpreted, whether that's considered to apply on appeal. I wish I did. But I will also say I appreciate your comment about claims being intricately connected. These claims that we're talking about had nothing to do with the other refund claims. These were claims for interference with their business. They really had nothing to do with the rates, the refunds, all that stuff. Well, they all arise out of the failure to give them their refunds. No. Their alleged refunds, no? In fact, no, nothing whatsoever to do with the claim to do refunds. The refund claim is based on rates for certain services. Here they're saying that they were denied other services, enhanced, advanced services that other pay phone owners got so they couldn't compete with them. Entirely different types of claims. And in fact, one of the statutes that they rely on, it gives exclusive jurisdiction to the PUC. So, again, there are other bases for dismissal of those claims besides statute of limitation. It's interesting. I was looking at our case law. There are instances where we get in a situation just like this, but where the Ninth Circuit reverses, we'll send it back to the district court and say, we reversed you on dismissing these federal claims. Reinstate the state law claims. That could happen. We do it. That could happen. I know. I've done it. I've done it. Yeah. That could happen here. Well, I hope the Court is not, well, that's not this case. This Court already affirmed that other earlier case. So that's not what's at issue here. Those claims are gone. Yeah. Those claims are gone. And likewise, these discrimination or interference with business claims, I think, are gone as well. Okay. Your Honor, I was prepared to talk about remand and all that. I didn't hear any questions about the propriety of the removal and denial of remand. But if you don't, if the Court does not have any questions. Do you have any position on the possibility of amendment of some of these claims? Should we remand to allow amendment? Well, I guess what I would say about that is this is the fifth case that plaintiffs have brought. This is the fifth case that has been dismissed. I honestly think they've been given, they've had, they've taken, I don't think they've been given, they've taken many opportunities to refine their claims. And they've certainly morphed and changed over time. But I can't imagine that there's anything to be served by giving them another chance to amend the claims. These claims are old. They've been rejected soundly. It seems to me like if any of these claims survive, they're just State law claims that will eventually end up in State court. Well, I would disagree with that. I think that some of these claims, specifically the unjust enrichment claim, which the district court analyzed, have necessary Federal issues. Well, I guess it would depend on what survives. Well, there are a list of Federal issues. The allegation of claim number two is that there's a violation of the FCC new services test rates. Precisely. The basis of that claim is that Quest was unjustly enriched. In Oregon law, that is, that means that you acquired property by a wrongful act. The only wrongful act alleged here is failing to comply with Federal law in the FCC's order. So that's a necessary element. If that claim accrued in 2001, it wouldn't make any difference if they got tolling under the Federal statute. Agreed. All right. Thank you. Thank you. All right. You've got one minute. We're being candid with you, Your Honor. The mic, the mic, please. You have a number of misapprehensions. This is governed by State law. These claims are exclusively State law. When we talk about the adoption of the original settlement agreement, settlement order, that was on State law grounds, totally. It predates the adoption of the TCA. And when we talk about the refunds initially granted, they were granted on the basis of Quest's proposed rates. And the only reason we have the confusion we do now is because under that settlement, the PUC wanted those refunds paid before there was a final rate determined. In the absence of that, what would have occurred was we would have appealed the order set in 01810. No refund would have been paid. We would have gone through the entire process. The final rates would have been set in 2007. Under those settlement orders, Quest was ordered to pay $277 million of refunds. And those refunds would have been allocated among the rate payers based on the difference between final rate and any higher interim rate. So these refunds that we're claiming would have been paid. Okay. The reason they don't get paid is because the PUC says we're going to pay the refunds before the final rates. And in order 06515, they go back and interpret those settlement orders and say if there are no refunds due as a result of a subsequent appeal, Quest, you have to pay. You also seem to assume that a claim accrued in 2001. It may have accrued in 2001 under Federal law, not under State law. Okay. So that we got that. Okay. And you're over your time. I'm sorry. You exhausted your one minute that I added. So we appreciate your arguments. We really do. We have spent, this is a complex case. And it's consumed a lot of time, at least for me. So thank you very much, counsel. We appreciate your arguments today. The matter is submitted. And that ends our session for today and for the week. And thank you all very much. Thank you.
judges: Paez, Bea, Anello